## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HEALTHY GULF<br>100 Common Street<br>Suite 902<br>New Orleans, LA 70112,<br><br>SIERRA CLUB<br>2101 Webster Street<br>Suite 1300<br>Oakland, CA 94612,<br><br>and,<br><br>CENTER FOR BIOLOGICAL DIVERSITY<br>378 N Main Avenue<br>Tucson, AZ 85701,<br><br>    *Plaintiffs*<br><br>    v.<br><br>DAVID BERNHARDT, in his official capacity as<br>ACTING SECRETARY OF THE INTERIOR<br>1849 C Street NW<br>Washington, DC 20240,<br><br>JOSEPH R. BALASH, in his official capacity as<br>ASSISTANT SECRETARY OF THE INTERIOR<br>FOR LAND AND MINERALS MANAGEMENT<br>1849 C Street NW<br>Washington, DC 20240,<br><br>U.S. DEPARTMENT OF THE INTERIOR<br>1849 C Street NW<br>Washington, DC 20240,<br><br>and,<br><br>BUREAU OF OCEAN ENERGY MANAGEMENT<br>1849 C Street NW<br>Washington, DC 20240,<br><br>    *Defendants*. | Civil Action No. |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      Plaintiffs Healthy Gulf, Sierra Club, and Center for Biological Diversity challenge the unlawful decision by Acting Secretary of the Interior David Bernhardt, acting through his delegated authority to the Department of the Interior and Bureau of Ocean Energy Management ("BOEM") (collectively, "Interior"), to hold Lease Sale 252 in the Gulf of Mexico in reliance on arbitrary environmental analyses, in violation of the National Environmental Policy Act ("NEPA") and the Administrative Procedure Act ("APA").

2.      The Gulf of Mexico is an ecologically rich area that is vitally important to the economy of coastal communities all along the Gulf Coast.  The Gulf is home to thousands of species of fish, sea turtles, whales, dolphins, and sea birds, many of which are already threatened or endangered with extinction.  Millions of people who live in the states along the Gulf Coast depend on this productive marine environment to support coastal fisheries, tourism, and recreation, the backbones of the Gulf States' economies.

3.      At the same time, the Gulf is host to nearly 2,000 oil platforms pumping oil and gas from more than 2,500 active leases.  This development comes with a huge cost to the environment, as well as to the coastal communities that rely on the Gulf for tourism, fishing, and their livelihoods.  Over 2,100 oil and chemical spills occur each year in the Gulf of Mexico, some of which are catastrophic, like the 2010 BP *Deepwater Horizon* disaster.

4.      In 2017, Interior began to offer for sale essentially all unleased acres in the Western and Central Gulf of Mexico in each of ten lease sales to be held between August 2017 and March 2022.  Around the same time, Interior also began engaging in a series of efforts to unravel critical drilling safety protections and to boost oil and gas development in shallow waters in the Gulf.

5.      On January 30, 2019, Interior signed a Record of Decision to hold Offshore Oil and Gas Lease Sale 252 on March 20, 2019.  Interior purported to have assessed the environmental effects of the lease sale, as required by NEPA, before reaching its decision to hold the sale for over 78 million acres, making it the largest lease sale in U.S. history.

6.      Interior's NEPA analyses suffer from two fundamental defects.  First, Interior turned a blind eye to the policies it had adopted and begun implementing — such as repealing significant drilling safety regulations and reducing royalty rates to spur development of marginal, shallow-water oil fields — that will considerably increase the effects and risks to the environment from oil and gas activities resulting from the lease sale.  Interior's irrational reliance on the false assumptions that preexisting, safer policies would remain in place led it to underestimate the likely effects and risks resulting from the lease sale.

7.      Second, Interior irrationally assumed that the same environmental effects would occur even if it did not hold the lease sale.  As a result, Interior failed to meaningfully consider the degree to which Lease Sale 252 would affect the environment compared to not holding the sale.

8.      Interior's arbitrary and capricious assumptions in its environmental analyses violate NEPA and resulted in Interior making its lease sale decision without an adequate understanding of the environmental effects, including how modifying the scope of the sale or the conditions on leases could minimize harms and risks to the environment and coastal communities.  Plaintiffs are currently in the midst of litigation challenging two lease sales Interior held in 2018 that relied on this same, flawed NEPA analyses.

9.      Plaintiffs therefore ask this Court to declare that Interior's decision to hold Lease Sale 252 violates NEPA and the APA, to vacate the unlawful decision to hold Lease Sale 252,

and to vacate or enjoin the leases issued pursuant to unlawful Lease Sale 252.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1333 (federal question) and 5 U.S.C. §§ 702–706 (APA).

11.     Venue is appropriate under 28 U.S.C. § 1391(e).

12.     This Court has authority to grant the requested relief in this case pursuant to the APA, 5 U.S.C. § 706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

## PARTIES

13.     Plaintiff HEALTHY GULF (formerly known as Gulf Restoration Network) is a network of community, conservation, environmental, and fishing groups and individuals committed to empowering people to protect and restore the natural resources of the Gulf of Mexico.  Healthy Gulf has been actively involved in efforts to strengthen oversight of the offshore oil and gas industry and end new oil and gas leasing in this region.  Healthy Gulf is headquartered in New Orleans, La., with offices in Pensacola, Fla., and Jackson, Miss.  Healthy Gulf's members live in the five Gulf states of Texas, Louisiana, Mississippi, Alabama, and Florida, and nationwide.  Healthy Gulf brings this action for itself and as representative of its members.

14.     Plaintiff SIERRA CLUB is a not-for-profit organization dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives.  Sierra Club is one of the oldest and largest conservation groups in the country, with about 800,000 members nationally in 64 chapters in all of the 50 states, the District

of Columbia, and Puerto Rico.  Sierra Club members use the public lands and waters throughout

the Gulf, including those that would be affected by oil and gas activities, for quiet recreation,

aesthetic pursuits, and spiritual renewal.  Sierra Club brings this action for itself and as

representative of its members.

15.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("Center") is a nonprofit

corporation that maintains offices across the country, including in:  Washington, D.C.;

California; Arizona; Florida; New York; Oregon; Washington; and Baja California Sur, Mexico.

The Center advocates for the protection of threatened and endangered species and their habitats

through science, policy, and environmental law.  The Center's mission also includes protecting

air quality, water quality, and public health.  The Center's Oceans Program focuses specifically

on conserving marine ecosystems, and seeks to ensure that imperiled species such as marine

mammals, corals, and sea turtles are properly protected from destructive practices in our oceans.

The Oceans Program also works to protect coastal communities from the air pollution, water

pollution, and other impacts that result from such practices.  In pursuit of this mission, the Center

has been actively involved in protecting the Gulf of Mexico from the harmful impacts of

offshore oil and gas drilling.  The Center has more than 69,500 members, including members

who live and recreate throughout the Gulf of Mexico region.  The Center brings this action for

itself and as representative of its members.

16.     Plaintiffs and Plaintiffs' members and staff regularly use, enjoy, and benefit from

the marine and coastal environments of the Gulf of Mexico, including waters within and adjacent

to the five Gulf states.  Plaintiffs and Plaintiffs' members and staff regularly enjoy and benefit

from the presence of healthy marine and avian life within those environments for recreational,

aesthetic, commercial, scientific, and environmental purposes, including whale watching, bird

watching, scientific study, boat touring, underwater diving, fishing, photography, and beach

bathing.  Lease Sale 252 will directly and irreparably injure these interests.  The abilities of

Plaintiffs and Plaintiffs' members and staff to pursue these interests hinge on the health of the

marine, coastal, and estuarine ecosystems (with clean water and oil-free beaches) and the well-

being of the species that live, migrate, feed, and breed in areas affected by oil and gas activities.

Interior continues to hold Gulf oil and gas lease sales and to authorize Gulf oil and gas activities

in the absence of an adequate NEPA analysis; the agency is authorizing additional oil and gas

development without a full and accurate analysis of its impacts or reasoned consideration of how

to avoid or mitigate those impacts.  As a result, Interior is enabling new oil and gas development

to negatively impact the environment in which Plaintiffs and Plaintiffs' members and staff have

an interest.  The interests of Plaintiffs and Plaintiffs' members and staff have been, are being,

and will be adversely affected by Interior's violations of federal law, as described herein.  These

harms can only be remedied if Interior is forced to comply with the requirements of NEPA and

the APA.  Plaintiffs have no other adequate remedy at law.

17.    Defendant DAVID BERNHARDT is sued in his official capacity as Acting

Secretary of the Interior.  He is the chief officer of the Department of the Interior charged with

overseeing the proper administration and implementation of the Outer Continental Shelf Lands

Act ("OCSLA").  OSCLA vests authority in the Secretary of the Interior to hold lease sales for

oil and gas rights on the Outer Continental Shelf and to issue leases.  The Secretary of the

Interior is required to comply with NEPA when taking any action affecting the environment.

18.    Defendant JOSEPH R. BALASH is sued in his official capacity as the Assistant

Secretary of the Interior for Land and Minerals Management.  The Assistant Secretary for Land

and Minerals Management is the official to whom the Secretary had delegated authority to sign

records of decision to hold lease sales under OCSLA.  The Assistant Secretary for Land and Minerals Management is required to comply with NEPA when taking any action affecting the environment.

19.     Defendant U.S. DEPARTMENT OF THE INTERIOR is the federal department with authority, through the Secretary, under OCSLA to hold lease sales for oil and gas rights on the Outer Continental Shelf and to issue leases.  The Department of the Interior is required to comply with NEPA when taking any action affecting the environment.

20.     Defendant BUREAU OF OCEAN ENERGY MANAGEMENT is the federal agency within the Department of the Interior to which the Secretary has delegated authority under OCSLA to hold lease sales for oil and gas rights on the Outer Continental Shelf and to issue leases.  BOEM is required to comply with NEPA when taking any action affecting the environment.

## STATUTORY BACKGROUND

I.     NATIONAL ENVIRONMENTAL POLICY ACT

21.     NEPA is this country's "basic national charter for protection of the environment." 40 C.F.R. § 1500.1; *see* 42 U.S.C. § 4331 *et seq.*  Its purpose is to "promote efforts which will prevent or eliminate damage to the environment."  42 U.S.C. § 4321.  The Council on Environmental Quality has promulgated regulations implementing NEPA, which are "binding on all federal agencies."  40 C.F.R. § 1500.3; *see id.* §§ 1500.1–1508.28.

22.     Congress enacted NEPA to ensure that federal agencies incorporate environmental concerns into the decisionmaking process.  42 U.S.C. § 4331(a)–(b).  To that end, NEPA compels agencies to evaluate prospectively the environmental impacts of proposed actions that they carry out, fund, or authorize and give the public a meaningful opportunity to participate in the decisionmaking process.

23.     NEPA requires all agencies of the federal government to prepare a "detailed statement" regarding all "major federal actions significantly affecting the quality of the human environment." *Id.* § 4332(2)(C). This statement, known as an Environmental Impact Statement ("EIS"), must describe: (1) the "environmental impact of the proposed action"; (2) any "adverse environmental effects which cannot be avoided should the proposal be implemented"; (3) alternatives to the proposed action; (4) "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity"; and (5) any "irreversible or irretrievable commitment of resources which would be involved in the proposed action should it be implemented." *Id.*; *see also* 40 C.F.R. § 1502.1.

24.     Under NEPA, "agencies must 'take a "hard look" at [the] environmental consequences' of their actions, and 'provide for broad dissemination of relevant environmental information.'" *Pub. Emps. for Envtl. Responsibility v. Hopper*, 827 F.3d 1077, 1082 (D.C. Cir. 2016) (alteration in original) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)). The EIS must fully consider and disclose the potential environmental impacts of proposed actions and alternatives to that action to take the "hard look" NEPA requires. 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1501.4, 1502.1(b), (c), 1502.5.

25.     NEPA requires agencies to use high quality, accurate scientific information and to ensure the scientific integrity of their analyses. 40 C.F.R. §§ 1500.1(b), 1502.24.

26.     In considering alternatives to the proposed action, the agency must examine the alternative of no action. *Id.* § 1502.14(d). The agency must compare the impacts of the proposed action with those of the no action alternative. *See* Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026, 18,027 (Mar. 23, 1981).

27.     To comply with NEPA, an agency must consider the site-specific impacts of the action as well as the cumulative impact of the proposed action when combined with other past, present, and reasonably foreseeable future actions.  40 C.F.R. §§ 1508.7, .8, .25, .27.

28.     An EIS must analyze the direct, indirect, and cumulative effects of the proposed action and any identified alternatives thereto.  *Id.* § 1508.25.  Direct effects are those effects "which are caused by the action and occur at the same time and place."  *Id.* § 1508.8(a).  Indirect effects are those effects "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable."  *Id.* § 1508.8(b).  Cumulative effects are those that "result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions."  *Id.* § 1508.7.  "Effects include ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative."  *Id.* § 1508.8.

29.     NEPA requires agencies to disclose and analyze measures to mitigate the impacts of proposed actions.  42 U.S.C. § 4332(2)(C)(iii); 40 C.F.R. §§ 1502.14(f), 1502.16(h).  An agency's analysis of mitigation measures must be reasonably complete in order to properly evaluate the severity of the adverse effects of an agency's proposed action and to inform the public and decisionmakers of ways to avoid or minimize harmful effects prior to the agency making a final decision.  *See* 40 C.F.R. §§ 1502.1, 1502.16, 1508.20.

30.     NEPA requires that an agency incorporate its environmental analysis into its decisionmaking process.  "NEPA's purpose is not to generate paperwork — even excellent paperwork — but to foster excellent action."  *Id.* § 1500.1(c); *see also id.* ("Ultimately . . . it is

not better documents but better decisions that count."); *id.* § 1502.1 ("primary purpose" of an EIS is to "serve as an action-forcing device to insure that the policies and goals defined in the Act are infused into the ongoing programs and actions of the Federal Government. . . . An environmental impact statement is more than a disclosure document.  It shall be used by Federal officials in conjunction with other relevant material to plan actions and make decisions.").

31.     The NEPA data and analyses supporting an agency's decision must be presented in the EIS.  *See id.* § 1502.1.  An agency may not rely on its record of decision to alter or augment its analyses or cure deficiencies in an EIS.

II.     OUTER CONTINENTAL SHELF LANDS ACT

32.     OCSLA governs the leasing, exploration, and development of oil and gas deposits in the Outer Continental Shelf.  43 U.S.C. § 1331 *et seq.*  The Outer Continental Shelf extends from the outer boundary of state waters — typically three nautical miles from shore — to the outer boundary of the United States' Exclusive Economic Zone, 200 nautical miles from shore. *Id.* §§ 1301(a)(2), 1331(a); 48 Fed. Reg. 10,605 (Mar. 14, 1983).

33.     In 1978, Congress amended OCSLA to provide, in part, for the development of resources on the Outer Continental Shelf "subject to environmental safeguards."  43 U.S.C. § 1332(3); *see* Pub. L. No. 95-372, 92 Stat. 632 *et seq.*

34.     OCSLA charges the Secretary of the Interior with managing oil and gas rights and activities on the Outer Continental Shelf.  *E.g.*, 43 U.S.C. §§ 1334(a), 1344(a).

35.     OCSLA prescribes four, tiered stages for the Secretary to sell and allow development of offshore oil and gas deposits:  1) five-year leasing programs; 2) lease sales; 3) exploration plans; and 4) development and production plans.  *Id.* §§ 1337, 1340, 1344, 1351.

36.     At the five-year program stage, the Secretary designates "the size, timing, and location of leasing activity" over an upcoming five-year period.  *Id.* § 1344(a).

37.     At the lease sale stage, the Secretary offers for sale leases that "entitle the lessee to explore, develop, and produce the oil and gas contained within the lease area," subject to certain approvals.  *Id.* § 1337.  A lessee may conduct ancillary activities on its lease without any further federal approval under OCSLA.  30 C.F.R. §§ 250.105, .207–.209.  These activities include geological and geophysical exploration, such as seismic reflection and refraction to detect the presence of oil or gas, and other surveys that are needed to determine how to explore or develop a lease.  *Id.* §§ 250.105, .207.

38.     The Secretary may cancel a validly issued lease only if he "determines, after a hearing, that (i) continued activity pursuant to the lease or permit would probably cause serious harm or damage . . . to the marine, coastal, or human environment; (ii) the threat of harm or damage will not disappear or decrease to an acceptable extent within a reasonable period of time; and (iii) the advantages of cancellation outweigh the advantages of continuing such lease or permit in force."  43 U.S.C. § 1334(a)(2)(A).  The Secretary first must suspend operations under the lease before canceling the lease.  OCSLA states that if the Secretary cancels a lease on the basis of these factors, the lessee is entitled to compensation.  *Id.* § 1334(a)(2)(B)–(C).

39.     BOEM is the federal agency within the Department of the Interior to which the Secretary has delegated authority to manage leasing, exploration, development, and production of oil and gas resources on the Outer Continental Shelf under OCSLA.  30 C.F.R. § 550.101. The Bureau of Safety and Environmental Enforcement ("BSEE"), also within the Department of the Interior, is the federal agency to which the Secretary has delegated authority to enforce safety and environmental standards for offshore oil and gas activities and to approve some activities. *Id.* § 250.101.

40.     BOEM begins the lease sale process by preparing and publishing a proposed

notice of lease sale.  *Id.* § 556.304.

41.    BOEM publishes a final notice of sale at least 30 days before holding the lease sale.  *Id.* § 556.308(a).

42.    BOEM awards and executes leases once the winning bidder files the necessary paperwork and fees.  *Id.* § 556.520.  A lease becomes effective on the first day of the month after BOEM executes the lease.  *Id.* § 556.521.

III.    ADMINISTRATIVE PROCEDURE ACT

43.    The APA confers a right of judicial review on any person who is adversely affected by agency action.  5 U.S.C. § 702.

44.    The APA provides that the reviewing court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id.* § 706(2)(A).

45.    The adequacy of an agency's NEPA analysis is reviewed under the APA.

## STATEMENT OF FACTS

I.    THE GULF OF MEXICO ECOSYSTEM

46.    The Gulf of Mexico is an extraordinary aesthetic, economic, and environmental resource to the five Gulf Coast states and the nation, supporting some of the most productive and biodiverse tropical and temperate ecosystems in the United States.

47.    The Gulf of Mexico is home to thousands of marine species, ranging from simple invertebrates, such as conchs and sponges, to complex and highly evolved fish and marine mammals.  The Gulf contains thousands of species of invertebrates, at least 600 species of fish, and 29 species of marine mammals.  In addition, five of the world's seven species of sea turtles, as well as hundreds of shore and coastal bird species, reside in or migrate through the Gulf of Mexico.  Over 300 species of coral, as well as other hard-bottom communities, wetlands,

seagrass beds, mangroves, and soft bottom communities, provide the habitats necessary to support this rich assemblage of marine life.  These diverse and highly complex habitats provide food, shelter, and spawning grounds for these species at various points during their life histories.

48.    Twenty-three marine species and two coastal bird species living in the Gulf of Mexico are listed as endangered or threatened under the Endangered Species Act.

49.    The Gulf of Mexico's environmental beauty and productivity also support a robust economy.  The region produces more than one-third of the nation's domestic seafood supply.  The Gulf's commercial fisheries and coastal tourism generate more than $40 billion annually in economic activity in the five Gulf Coast states.

II.    A PATTERN OF ENVIRONMENTAL HARMS FROM OIL AND GAS DEVELOPMENT

50.    Existing oil and gas exploration, development, and production on the Gulf of Mexico Outer Continental Shelf is extensive.  As of this date, there are nearly 2,000 active offshore oil and gas platforms and more than 2,500 active oil and gas leases in the Gulf.

51.    Oil and gas leasing, exploration, development, and production, along with their associated operations, involve numerous activities that individually and collectively have myriad adverse effects on the Gulf's species and habitats.  Lessees conduct seismic surveys to locate oil and gas deposits; drill wells; install pipelines and other structures on the seafloor and through coastal wetlands; pump oil and gas to the surface; load and transport oil, gas, and cargo on ships; produce liquid, solid, and gaseous waste; and conduct other activities with harmful environmental effects.

52.    Effects from these activities on the environment include vessel strikes, noise (from vessels, seismic surveys, construction, and general operations), oil spills (both large and small), bottom habitat destruction, and marine debris and other water pollution.  Oil and gas

activities also degrade air quality, contribute to climate change, erode coastal wetlands, impair

commercial and recreational fishing opportunities, harm archaeological resources, and degrade

recreational and aesthetic experiences.

53.    The harms from oil and gas activities can become catastrophic, as when the

*Deepwater Horizon* rig exploded and sank on April 20, 2010, killing eleven people and causing

the biggest environmental disaster in the history of the Gulf.  *See generally In re Oil Spill by Oil*

*Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*, 21 F. Supp. 3d 657 (E.D. La. 2014).

54.    The *Deepwater Horizon* explosion caused oil to gush from the well on the seabed,

nearly 5,000 feet below the ocean's surface, for months until the well finally was capped in mid-

July 2010.  The result was the largest oil spill in the history of the United States and a cleanup

and containment effort that at its height enlisted 50,000 workers on land and sea.

55.    Over the 87 days during which the well remained uncapped, over 100 million

gallons of oil and unquantified amounts of natural gas flowed freely into the Gulf.  In an effort to

break apart large concentrations of oil, responders released 1 million gallons of toxic dispersants

into Gulf waters.

56.    The spill contaminated over 112,000 square kilometers of ocean waters and over

2,100 kilometers of shoreline in the Gulf.

57.    As Interior described:

[T]he Spill caused impacts to coastal and oceanic ecosystems ranging from the
deep ocean floor, through the oceanic water column, to the highly productive
coastal habitats of the northern Gulf, including estuaries, shorelines and coastal
marshes.  Affected resources include ecologically, recreationally, and
commercially important species and their habitats in the Gulf and along the
coastal areas of Texas, Louisiana, Mississippi, Alabama, and Florida.  These fish
and wildlife species and their supporting habitats provide a number of important
ecological and recreational use services.

U.S. Dep't of Interior, et al., *Deepwater Horizon Oil Spill Natural Resource Damage*

*Assessment: Programmatic and Phase III Early Restoration Plan and Early Restoration Programmatic Environmental Impact Statement* Ch. 1, p. 1 (2014).

58.    Scientists estimate the spill caused death or serious harm to billions, if not trillions, of animals, including over 100,000 individuals of species listed as threatened or endangered.  The spill marred coastal and bottom habitats, causing severe damage to the ecosystems that support the Gulf's biodiversity.

59.    The harm from the spill to marine and coastal species and the environment persists to this day.

60.    While the *Deepwater Horizon* disaster's effects were, and remain, catastrophic, oil and gas operations in the Gulf of Mexico continue to experience accidents, spill oil, and otherwise cause environmental harm on a daily basis.  Each year on average, approximately 2,100 oil and chemical spills in the Gulf are reported to the Coast Guard and three workers die from accidents in Gulf oil and gas operations.  Gulf Restoration Network, *Oil and Gas in the Gulf of Mexico* 3 (2018), *available at* https://healthygulf.org/sites/healthygulf.org/files/oilgasreportweb_final.pdf.

61.    From 2011 through 2016, Interior's records show more than four losses of well control per year on average in the Gulf.  And Interior's records show there is a fire offshore in the Gulf every three days on average.

62.    In recent years, drilling activity has been shifting to deeper waters and into high-heat and high-pressure geologic formations, where the risks of well blowouts and catastrophic oil spills are greater.

63.    Oil and gas development and production in the Gulf also contribute significantly to climate change.  In addition to greenhouse gases emitted by exploration, development, and

production operations, the oil and gas produced in the Gulf is shipped and burned throughout the world, emitting hundreds of millions of tons of greenhouse gases annually.

III.    BSEE'S INITIAL RESPONSE TO THE DEEPWATER HORIZON DISASTER AND SUBSEQUENT REVERSAL OF SAFETY REGULATIONS

64.    In the aftermath of the *Deepwater Horizon* disaster, BSEE promulgated several safety regulations to implement recommendations for reducing the risks of another major oil spill made by various expert working groups on the disaster.

65.    On April 29, 2016, BSEE issued its Blowout Preventer Systems and Well Control Rule [hereinafter Well Control Rule] "to prevent future well-control incidents, including major incidents like the 2010 *Deepwater Horizon* catastrophe."  81 Fed. Reg. 25,888, 25,890 (Apr. 29, 2016).  The rule created a number of new safety measures — such as requiring safe drilling margins and real-time monitoring — and substantially strengthened requirements for blowout preventers and well cementing and casing.  *Id.* at 25,894.  Each of the new measures improves drilling safety by a considerable degree.

66.    On September 7, 2016, BSEE issued its Oil and Gas Production Safety Systems Rule [hereinafter Production Safety Rule] to "improve worker safety and protection of marine and coastal ecosystems by helping to reduce the number of production-related incidents resulting in oil spills, injuries, and fatalities."  81 Fed. Reg. 61,834, 61,838 (Sept. 7, 2018).  The rule, among other things, "[u]pdated and improved safety and pollution prevention equipment (SPPE) design, maintenance, and repair requirements," including adding a new standard that the equipment be inspected and certified by a third party.  *Id.* at 61,834.  Each of the new measures improves production safety by a considerable degree.

67.    But less than one year later, President Trump issued Executive Order 13,783 directing the heads of every federal agency to review all policies and regulations "that potentially

burden the development or use of domestic" fossil fuels.  Exec. Order No. 13,783, 82 Fed. Reg.

16,093, 16,093 (Mar. 31, 2017).  The Executive Order required agency heads to, "as soon as

practicable, suspend, revise, or rescind" those policies or regulations.  *Id.* at 16,094.

68.     On May 1, 2017, the Secretary of the Interior issued Secretarial Order 3350

specifically directing BSEE to review, reconsider, and recommend revising or rescinding

provisions of the Well Control Rule to ensure that "exploration and development [of oil and gas

on the Outer Continental Shelf] is promoted and not unnecessarily delayed or inhibited."  Sec'y

of Interior, Secretarial Order 3350, at 2 (May 1, 2017).

69.     By late November 2017, BSEE had developed concrete proposals to substantially

revise and repeal many of the most important safety provisions from the Production Safety Rule

and Well Control Rule.

70.     In December 2017, BSEE asked the Office of Management and Budget to review

its proposed rule to rescind many of the safety measures BSEE previously had enacted through

the Well Control Rule.

71.     On December 29, 2017, BSEE published a proposed rule to revise and rescind

parts of the Production Safety Rule.  82 Fed. Reg. 61,703 (Dec. 29, 2017).  As Plaintiffs, along

with others, explained in comments on the proposed rule, the proposed changes increase the risk

of drilling safety system failures by removing requirements that ensure the systems will function

effectively.  Specifically, the proposed rule eliminates inspection requirements and defers to

industry guidance on system designs.  *See id.* at 61,704.

72.     BSEE finalized these changes to the Production Safety Rule in 2018.  83 Fed.

Reg. 49,216 (Sept. 28, 2018).

73.     On May 11, 2018, BSEE published its proposed rule to rescind many of the safety

measures — and revise others — it had enacted through the Well Control Rule.  83 Fed. Reg.

22,128 (May 11, 2018).  Most critically, BSEE proposed to:  (1) eliminate requirements to obtain

regulator approval before taking certain higher-risk, alternative drilling actions; (2) eliminate

required improvements to blowout preventers (the primary piece of equipment that failed in the

*Deepwater Horizon* disaster); (3) remove requirements to monitor wells in real-time to detect

potential problems; (4) eliminate required independent certifications that certain equipment will

function properly; and (5) eliminate or revise the requirement to ensure that well pressures are

kept at a commonly accepted safe level.  *See id.* at 22,132–42.

      74.     BSEE submitted its final rule revising the Well Control Rule to the Office of

Management and Budget for review on December 13, 2018.  BSEE's issuance of the final cuts to

the Well Control Rule is imminent.  *See* 83 Fed. Reg. 58,040, 58,041 (Nov. 16, 2018) (planning

"final action" on rollback in December 2018).

      75.     The safety measures that BSEE has proposed to rescind or revise in the Well

Control Rule are critically important for preventing spills, reducing the impacts of spills that may

occur, and protecting worker safety.

      76.     BOEM has repeatedly recognized that reducing regulatory oversight of offshore

drilling makes both losses of well control and catastrophic oil spills more likely.

IV.    NEW POLICIES TO INCREASE OFFSHORE OIL AND GAS DEVELOPMENT

      77.     Against this backdrop, Interior has begun to execute an unprecedented oil and gas

leasing program in the Gulf of Mexico.

      78.     Prior to 2017, Interior had never held a lease sale encompassing the entire Gulf of

Mexico (excepting the area subject to a Congressional moratorium).  Rather, it held separate

lease sales for the three discrete planning areas of the Gulf:  the Western, Central, and Eastern

Planning Areas.

79.     The Western Planning Area extends offshore from the Texas-Louisiana border to the Mexico border.  The Central Planning Area extends offshore from the Texas-Louisiana border to the Alabama-Florida border.  The Eastern Planning Area covers Gulf waters offshore of Florida eastward of the state's border with Alabama.  Most of the Eastern Planning Area is presently subject to a Congressional moratorium on new leasing from 2006–2022.

80.     Interior changed its leasing approach on March 16, 2016, when it published a proposed five-year leasing program for 2017–2022 that would offer essentially all unleased acres in the Central and Western Planning Areas, as well as the portion of the Eastern Planning Area not subject to a Congressional moratorium for lease in each of ten lease sales:  two per year.  *See* 81 Fed. Reg. 14,881 (Mar. 16, 2016).  Increasing the supply of available acreage in each lease sale has the effect of reducing the competition among oil companies for the leases, which consequently drives down bid prices and enables companies to acquire broader swaths of oil and gas leases.

81.     Interior also took action to boost offshore oil and gas production on July 6, 2017, when it announced it was reducing the royalty rate that companies pay the federal treasury for oil and gas extracted from leases in shallow waters (<200 meters) from 18.75% to 12.5%, effective beginning with Gulf of Mexico Offshore Lease Sale 249.  The purpose of the reduction was to encourage additional oil and gas leasing and development in shallow Gulf waters, where exploration and development had been in decline.

V.     NEPA PROCESS FOR GULF OF MEXICO OIL AND GAS LEASING

82.     During the multi-stage process leading up to Lease Sale 252, BOEM prepared three separate EISs to evaluate both the 2017–2022 Program and the Gulf of Mexico lease sales under that program:  a programmatic EIS on the nationwide 2017–2022 Program, a programmatic EIS on the Gulf of Mexico lease sales under the Program, and a 2018

supplemental EIS on the effects of a proposed lease sale.  BOEM relied on the 2018

Supplemental Lease Sale EIS in reaching its decision to hold Lease Sale 252, which in turn

tiered to and incorporated by reference the two programmatic EISs.

83.     A number of conservation groups, including Plaintiffs, filed comments with

BOEM on all three EISs during the public comment periods.  These comments highlighted

BOEM's failure to fully disclose, evaluate, or consider numerous factors, and detailed serious

problems with the agency's analyses and consideration of available mitigation for the myriad

environmental harms caused by oil and gas development.

### 1.     Programmatic EIS for the 2017–2022 Program

84.     BOEM released a draft programmatic EIS on the 2017–2022 Program on March

18, 2016.  *See* 81 Fed. Reg. 14,885 (Mar. 18, 2016).  The EIS's stated purpose was to assess at a

general level the effects of activities that could occur under leases issued pursuant to the

Program, including exploration, development, and production activities.

85.     BOEM finalized the programmatic EIS for the 2017–2022 Program [hereinafter

5-Year Program EIS] in late 2016.  *See* 81 Fed. Reg. 83,870 (Nov. 22, 2016).

86.     On January 17, 2017, the Secretary of the Interior approved the 2017–2022 Outer

Continental Shelf Oil and Gas Leasing Program, which provided for ten region-wide lease sales

in the Central and Western Planning Areas in the Gulf of Mexico, as well as the portion of the

Eastern Planning Area in the Gulf not subject to a Congressional moratorium, and issued a

Record of Decision for the 5-Year Program EIS.  *See* 82 Fed. Reg. 6643 (Jan. 19, 2017).

### 2.     Programmatic EIS for Gulf of Mexico 2017–2022 Leasing

87.     On April 22, 2016, BOEM provided notice of availability of a draft programmatic

EIS purporting to evaluate the environmental effects of a single given lease sale in the Gulf of

Mexico under the 2017–2022 Program.  81 Fed. Reg. 23,747 (Apr. 22, 2016).  The stated

purpose of this draft programmatic EIS was to assess at a general level the effects of activities likely to occur on leases executed in a single given lease sale in the Gulf pursuant to the 2017–2022 Program under certain oil and gas price and demand scenarios, including exploration, development, and production activities.  The EIS did not assess the combined effects of all ten proposed lease sales.

88.     On March 10, 2017, BOEM published notice of availability of the final programmatic EIS on the environmental effects of a single given lease sale planned for the Gulf of Mexico in 2017–2022 [hereinafter Gulf Program EIS].  82 Fed. Reg. 13,363 (Mar. 10, 2017).

*3.     2018 Supplemental EIS*

89.     On August 19, 2016, BOEM published a notice of intent to prepare a supplemental EIS to "focus on new information released since the publication" of the Gulf Program EIS.  81 Fed. Reg. 55,480 (Aug. 19, 2016).

90.     On March 31, 2017, BOEM published notice of availability of a draft supplemental EIS.  82 Fed. Reg. 16,060 (Mar. 31, 2017).  The draft supplemental EIS stated that it analyzed the effects of a single region-wide lease sale under the 2017–2022 Program, and was intended to tier from and update the 5-Year Program EIS and Gulf Program EIS.  The stated purpose of the draft supplemental EIS was to assess the effects of activities likely to occur on leases executed in a single given lease sale, including broadly the effects of exploration, development, and production activities.

91.     BOEM accepted public comments on the draft EIS through May 15, 2017.

92.     On December 15, 2017, BOEM announced the availability of the final supplemental EIS [hereinafter Lease Sale EIS].  82 Fed. Reg. 59,644 (Dec. 15, 2017).

VI.     BOEM'S DECISION TO HOLD OFFSHORE LEASE SALE 252

93.     On September 27, 2018, BOEM announced the availability of the Proposed

Notice of Sale for Lease Sale 252 in the Gulf of Mexico, which proposed to offer for lease on

March 20, 2019, nearly all unleased blocks in the Western and Central Planning Areas, as well as

additional unleased blocks in the Eastern Planning Area not subject to Congressional

moratorium.  83 Fed. Reg. 48,863 (Sept. 27, 2018).

94.    The Proposed Notice of Sale announced a royalty rate of 12.5% for leases situated

in water depths less than 200 meters and 18.75% for leases situated in water depths of 200

meters and deeper.

95.    BOEM did not provide any opportunity for public comment or participation after

it issued its Proposed Notice of Lease Sale.

96.    On January 30, 2019, Defendant Joseph Balash, the Assistant Secretary of the

Interior for Land and Minerals Management, signed a Record of Decision to hold Lease Sale 252

on March 20, 2019, as proposed, relying on the flawed analyses in the Lease Sale EIS.  *See* 84

Fed. Reg. 4531 (Feb. 15, 2019).

97.    The Record of Decision relied on BOEM's analysis of the environmental effects

of holding Lease Sale 252 in the Lease Sale EIS, which in turn tiered from and incorporated by

reference the 5-Year Program EIS and Gulf Program EIS.

98.    On February 15, 2019, BOEM published a Final Notice of Sale for Lease Sale

252 to hold the sale according to the terms proposed in the Proposed Notice of Sale.  84 Fed.

Reg. 4525 (Feb. 15, 2019).  The area available for lease is approximately 78.4 million acres,

making it the largest oil and gas lease sale in U.S. history.

99.    The 12.5% shallow-water royalty rate and proposed weakened safety measures

will apply to oil and gas operations conducted under leases purchased in Lease Sale 252.

100.    Lease Sale 252 is the third lease sale BOEM is holding that relies on the flawed

Lease Sale EIS.  On July 16, 2018, Plaintiffs filed litigation challenging the two lease sales

BOEM held in 2018 (Offshore Lease Sales 250 and 251) that relied on that EIS.

VII.    BOEM'S ARBITRARY AND CAPRICIOUS ANALYSES OF THE
        ENVIRONMENTAL EFFECTS OF LEASE SALE 252

        101.    Several analyses in the three, tiered EISs are based on incorrect and illogical

assumptions, fatally undermining the analyses and causing BOEM to significantly underestimate

and otherwise misjudge and misstate the effects that a lease sale in the Gulf of Mexico will have

on the human and natural environment.

        102.    It is critical that BOEM accurately assess the effects of oil and gas exploration,

development, and production likely to result from a lease sale at the lease sale stage because that

is the last opportunity the agency has to adjust the number or locations of blocks it offers for

lease to avoid unacceptable environmental impacts.  *See, e.g.*, 81 Fed. Reg. at 55,480 ("During

the pre-lease sale process, the size of any individual lease sale could be reduced, and a smaller

area offered for leasing, should circumstances warrant.").

        A.    <u>Flawed Assessments and Misleading Disclosures Regarding the Risks of
              Accidental Events</u>

        103.    BOEM's assessments and disclosures of the risks of blowouts, catastrophic oil

spills, and losses of well control, as well as other accidental events that could affect the

environment, in the three EISs are fatally flawed and misleading due to BOEM's incorrect

assumptions regarding critical safety measures.

              1.    *Irrational Reliance on Outdated Regulations*

        104.    BOEM relied substantially on safety measures previously enacted through the

Production Safety Rule and Well Control Rule when assessing and disclosing the risks of

blowouts, catastrophic oil spills, and losses of well control in each of the EISs.

        105.    In the 5-Year Program EIS, BOEM stated that a catastrophic oil spill was not

expected to occur as a result of leasing activities.  BOEM explained that "[r]ecently implemented safeguards, including [new blowout preventer and well safety requirements], and additional regulatory oversight make [a significant loss of well control and oil spill] less likely than in the past."

106.    In the Gulf Program EIS, BOEM concluded that blowouts and losses of well control are rare and of short duration and that blowouts resulting in catastrophic oil spills are not reasonably foreseeable.  BOEM cited the Well Control Rule's safety measures in its discussion of the likelihood of blowouts and losses of well control.

107.    BOEM also concluded in the Lease Sale EIS that blowouts and losses of well control are rare and of short duration and that blowouts resulting in catastrophic oil spills are not reasonably foreseeable.  In its response to comments on its analysis of blowout and oil spill risks in the Lease Sale EIS, BOEM stated that the Well Control Rule "decrease[s] the probability" of those risks.

108.    In both the Gulf Program EIS and Lease Sale EIS, BOEM noted "reforms" implemented since the *Deepwater Horizon* disaster when discussing the allegedly low risks of blowouts, large oil spills, and losses of well control.  The sources BOEM cited for detail on these "reforms" list both the Production Safety Rule and Well Control Rule as significant measures to reduce risks of accidental events from oil and gas activities.

109.    BOEM's reliance on the Production Safety Rule and Well Control Rule led it to conclude in each EIS that blowouts and losses of well control are rare and not reasonably foreseeable or likely to occur as a result of a lease sale.

110.    In the three EISs, BOEM did not consider how the proposed revisions to the Production Safety Rule and Well Control Rule would affect the environmental risks from the oil

and gas activity expected to occur under a lease sale.

111.    Plaintiffs submitted comments on the draft Lease Sale EIS stating that BOEM must consider how planned rollbacks of the Production Safety Rule and Well Control Rule will affect risks to the environment.  BOEM stated in its response to comments in the Lease Sale EIS that it was aware of the Secretary's concurrent review of and plan to repeal or revise the Production Safety Rule and Well Control Rule but did not consider those planned rescissions when considering, assessing, or disclosing drilling risks.

112.    By December 2017, BSEE had drafted and submitted to the Office of Management and Budget for review proposed rules to substantially revise and rescind parts of the Production Safety Rule and Well Control Rule.

113.    The revisions and rescissions of those rules' safety provisions were identified proposals and were reasonably foreseeable actions when BOEM finalized the Lease Sale EIS.

114.    Because the Secretary has ultimate responsibility for all actions taken under OCSLA and because BOEM and BSEE both act under the Secretary's delegated OCSLA authority, BOEM knew or should have known that BSEE was substantially revising and rescinding the two safety rules when it finalized the Lease Sale EIS.

115.    BSEE's proposals to substantially revise and rescind important safety measures in the Production Safety Rule and Well Control Rule fatally undermine BOEM's assumptions and disclosures in the three EISs regarding the risks of blowouts, catastrophic oil spills, and losses of well control.  As a result, BOEM's disclosures of these risks are arbitrary and misleading.

116.    BSEE's proposals to substantially revise and rescind important safety measures in the Production Safety Rule and Well Control Rule fatally undermine BOEM's assumptions in the three EISs that the two rules will significantly reduce the risks of blowouts, catastrophic oil

spills, and losses of well control.  As a result, BOEM's assessments of these risks are arbitrary and capricious.

117.    In the Record of Decision for Lease Sale 252, Interior acknowledged that it did not consider, assess, or disclose the proposed revisions of the Production Safety Rule and Well Control Rule in any of the three EISs.  However, Interior asserted that BOEM's previous assessment of the environmental effects of the proposed lease sale remains valid because BOEM agreed with BSEE's statements in draft environmental assessments for the proposed Production Safety Rule and Well Control Rule revisions that the revisions would not change environmental risks.  BOEM did not independently assess whether BSEE's statements are accurate or reasonable.

### 2.    Irrational Reliance on Presumed Enforcement of Safety Regulations

118.    In each of the three EISs, BOEM relied substantially on the implementation and enforcement of all of Interior's offshore safety regulations when assessing and disclosing the risks of accidental events, like oil spills, on the environment.  BOEM specifically cited BSEE's enforcement of the safety regulations when discussing accidental events in each EIS.

119.    A February 2016 Government Accountability Office ("GAO") report found that BSEE was not adequately enforcing its safety regulations.

120.    Commenters on all three EISs, including Plaintiffs, asked BOEM to consider and analyze whether the GAO report undermined BOEM's assumptions in the EISs that Interior's safety regulations would be effective.

121.    BOEM never did so.  In the 5-Year Program EIS, BOEM stated that it would consider the GAO report's findings at the lease sale stage.  But in the Gulf Program EIS and Lease Sale EIS, BOEM stated it would not consider the GAO report's findings at the lease sale stage.

122.     BOEM's failure to consider or analyze the findings in the GAO report on BSEE's inadequate enforcement of its safety regulations fatally undermines BOEM's assumptions and disclosures in the three EISs that safety regulations would be implemented adequately and effectively reduce the risks and occurrences of accidental harms to the environment.

B.     BOEM's Failure to Incorporate Effects of the Royalty Rate Reduction into its Forecasts of Oil and Gas Exploration, Development, and Production Activities

123.     BOEM used an incorrect royalty rate in the Lease Sale EIS to forecast the levels of oil and gas exploration, development, and production activities likely to result from a lease sale, leading to a significant underestimate of those levels and, accordingly, the environmental effects of the sale.

124.     To assess the likely effects of a lease sale in the Gulf of Mexico, BOEM first had to identify the potential oil and gas exploration, development, and production activities that would occur as a result of the lease sale and forecast the levels of those activities.

125.     BOEM characterized each of the different types of activity or process that could occur as a result of the lease sale as an "impact-producing factor."  BOEM uses "impact-producing factor" as a term of art and defines it to mean "an activity or process, as a result of a proposed lease sale, that could cause impacts on the environmental or socioeconomic setting."  Impact-producing factors, as defined by BOEM, include activities or processes that are routine (*e.g.*, drilling a well or operating a pipeline), as well as those that are accidental or unexpected (*e.g.*, an oil spill, spill response, or vessel collision).

126.     BOEM created different "scenarios" of activity levels for all impact-producing factors that could result from a lease sale depending on a number of elements, including, specifically, the price of oil, the cost of development, and "factors that influence oil and gas product-price."  BOEM forecast the activity levels that could occur under different scenarios by

varying the values of the elements used in the forecast; for example, by using a higher or lower price of oil. BOEM evaluated a "low activity scenario" and a "high activity scenario" for each of the action alternatives. In turn, BOEM used those scenarios to evaluate the context and intensity of the sale's environmental impacts. A greater level of an impact-producing factor by definition will result in a greater magnitude of environmental impacts from that factor.

127.    A significant cost of development is the royalty rate a lessee must pay the federal treasury for extracted oil or gas. A lower royalty rate reduces the cost of development. A lower cost of development increases the amount of oil and gas exploration, discovery, development, and production activities ("oil and gas activity") expected to occur and therefore the levels of the impact-producing factors.

128.    The royalty rate also influences the oil and gas product-price. Cost savings due to a lower royalty rate can be passed on to the consumer, resulting in a lower product-price. A lower product-price will result in higher oil and gas demand, thereby increasing the amount of oil and gas activity expected to occur and, consequently, the levels of the impact-producing factors.

129.    When BOEM published its draft Lease Sale EIS in March 2016, the royalty rate for leases in less than 200 meters of water was 18.75%.

130.    BOEM assumed a royalty rate of 18.75% for leases in less than 200 meters of water when it calculated the cost of development and the factors influencing oil and gas product-price in its forecasts of oil and gas activity expected to occur and the associated levels of impact-producing factors in the draft Lease Sale EIS and the two programmatic EISs.

131.    On July 6, 2017, BOEM announced it was reducing the royalty rate for leases in less than 200 meters of water from 18.75% to 12.5%. The royalty rate decrease reduced the cost of development and increased the marginal rate of return for leases in waters less than 200

meters.  Indeed, BOEM decreased the royalty rate with the express intent to spur increased exploration, development, and production in waters less than 200 meters by reducing the cost to lessees of development and thereby increasing the marginal rate of return.

132.    The royalty rate reduction therefore considerably modified at least two of the primary factors BOEM used to forecast levels of impact-producing factors expected to occur: the cost of development and the oil and gas product-price.

133.    BOEM's forecast of the levels of impact-producing factors expected to occur did not change between the draft Lease Sale EIS and final Lease Sale EIS.  BOEM therefore did not incorporate the new 12.5% royalty rate for leases in less than 200 meters of water into its forecasts of the levels of impact-producing factors expected to occur in the Lease Sale EIS. Rather, the final Lease Sale EIS assumed the outdated 18.75% royalty rate still applied.

134.    In its Record of Decision for Lease Sale 252, Interior acknowledged that BOEM assumed a royalty rate of 18.75% for leases in less than 200 meters when it "modeled the range of anticipated oil and natural gas production volumes and associate levels of exploration, development, and decommissioning activity" in the three EISs.  Interior asserted — without further explanation or evidence — that at some time after issuance of the EIS, BOEM had "reanalyzed" the expected activity from Lease Sale 252 under the reduced royalty rate and concluded the activity under the lower royalty rate was within "the margin of error" of its original analyses in the three EISs.

135.    BOEM's failure to incorporate the lower royalty rate into its forecast in the Lease Sale EIS of oil and gas activity and the associated levels of impact-producing factors expected to occur caused it to significantly underestimate the degrees of exploration, development, production, and other impact-producing factors likely to occur from leases in less than 200

meters of water.  The underestimate of oil and gas activity and levels of impact-producing factors

expected to occur prevented BOEM from accurately assessing in the Lease Sale EIS the

environmental effects likely to result from a proposed lease sale, and led BOEM to significantly

underestimate and misstate in the Lease Sale EIS the environmental effects from activities under

leases sold in less than 200 meters of water.

        C.    <u>BOEM's Arbitrary and Inconsistent Assumptions that Cancelling Lease Sale 252<br>Would Have the Same Environmental Effects as Holding the Sale</u>

      136.    BOEM purported to assess the environmental effects of not holding a proposed

lease sale in the Gulf (i.e., a "no action alternative") in the Gulf Program EIS and Lease Sale

EIS.  BOEM paradoxically concluded that not holding the lease sale would result in essentially

the same environmental effects as holding the lease sale.

      137.    BOEM did not rationally explain why the no action alternative would result in the

same increase in environmental impacts as holding the lease sale.

      138.    Rather, BOEM irrationally speculated that, although the no action alternative

would prevent new oil and gas activities, those activities would inevitably occur in the same

manner and magnitude under an unspecified future lease sale.  BOEM provided no rational

support for the proposition that an unspecified lease sale would be held in the future and would

sell the same projected number of lease blocks as the proposed lease sale, or that the same

manner and degree of impact-producing factors would result.

      139.    BOEM's assumptions of identical future impacts for its proposed lease sale and

the no action alternative are particularly unreasonable given the expansive scope of this proposed

lease sale.  The Secretary's practice for nearly four decades had been to offer smaller, discrete

portions of the Gulf of Mexico in each lease sale.  Offering essentially all unleased acres in the

Western and Central Planning Areas is the exception to the rule.  BOEM cannot rationally

assume this deviation from the typical leasing practice will become the established regime in future five-year programs and thus result in the same leases and effects occurring if the proposed lease sale were not held.

140.    BOEM's assumptions of identical future impacts also are particularly unreasonable given the highly volatile nature of oil and gas supply and demand over time. For example, lower oil and gas demand or increased supply from elsewhere in the future would result in lower industry interest in purchasing leases in the Gulf of Mexico. BOEM cannot rationally assume industry will have the same demand for and acquire the same offshore leases in the future when U.S. and worldwide supply and demand and prices for oil and gas will be different.

141.    BOEM's assumptions of identical future impacts also are particularly unreasonable given advances in drilling technology and geologic information over time. For example, there is significantly more industry interest in deepwater tracts now than there was several years ago, resulting in significantly different patterns of lease bidding and, subsequently, risks and effects from development of those leases. BOEM cannot rationally assume industry will seek to lease in the future the same areas it projects for leasing in 2019, as opposed to seeking deepwater leases at a higher rate.

142.    BOEM's conclusion that the no action alternative and proposed lease sale would have the same environmental effects also is irreconcilably inconsistent with its conclusions about the amount of oil and gas exploration, development, and production activities that would result from the two alternatives.

143.    BOEM concluded that selecting the no action alternative would prevent any new oil and gas activities in the areas that would be offered for lease under the proposed lease sale. Conversely, BOEM forecasted that holding a single lease sale in the Gulf in 2019 would

substantially increase the amount of oil and gas exploration, development, and production in the area.  For example, BOEM projected that a single lease sale would result in between 53 and 984 new exploration and delineation wells, between 61 and 767 new development and production wells, and between 355 and 2,144 kilometers of new pipelines.  BOEM did not explain how drilling hundreds of new wells and installing supporting infrastructure on the one hand will have the same environmental effects as preventing these activities on the other hand.

144.    BOEM's faulty assumption that the same effects would occur under the no action alternative as under the proposed lease sale created an improper standard against which to compare the expected effects of the proposed lease sale, as required by NEPA.  *See* 46 Fed. Reg. at 18,027.  This faulty assumption prevented BOEM from accurately assessing the environmental effects likely to result from the proposed lease sale.  BOEM's equation of the effects of the proposed lease sale with those of the no action alternative caused it to significantly underestimate and undervalue the environmental effects of the proposed lease sale and violates its duty to take a hard look at the environmental effects of the action and alternatives to that action.

## CLAIMS FOR RELIEF

### First Cause of Action

**Violation of NEPA and APA:  Failure to Take a Hard Look at the Effects of the Action Using Accurate Assumptions**

145.    The allegations made in paragraphs 1–144 are realleged and incorporated by this reference.

146.    The Record of Decision for Lease Sale 252 is final agency actions for which there is no other adequate remedy in a court.  *See* 5 U.S.C. § 704.

147.    BOEM was required to complete an EIS prior to reaching its decision to hold Lease Sale 252.  42 U.S.C. § 4332(2)(C); *see Sec'y of the Interior v. California*, 464 U.S. 312,

338 (1984); *Native Vill. of Point Hope v. Jewell*, 740 F.3d 489, 494 (9th Cir. 2014).

148.    NEPA requires that BOEM take a "hard look" at the environmental consequences

of its actions in its EIS before action is taken.  *Pub. Emps. for Envtl. Responsibility v. Hopper*,

827 F.3d 1077, 1082 (D.C. Cir. 2016).  NEPA and its implementing regulations require BOEM

to assess the environmental impacts of the proposed action, including direct, indirect, and

cumulative effects, which are reasonably foreseeable in its EIS.  42 U.S.C. § 4332(C); 40 C.F.R.

§§ 1502, 1508.7, 1508.8; *see also Point Hope*, 740 F.3d at 494.  NEPA and its implementing

regulations further require BOEM to use high quality, accurate scientific information in its EIS

and to ensure the scientific integrity of this analysis.  40 C.F.R. § 1500.1(b); *see also* 42 U.S.C. §

4332(2)(C); 40 C.F.R. § 1502.24.

149.    NEPA requires BOEM to disclose and analyze an action's environmental effects

in an EIS; the agency may not conduct post-EIS analysis to support its conclusions.

150.    The presentation of incomplete or misleading information in an EIS violates

NEPA.

151.    BOEM relied on the Lease Sale EIS in reaching its decision to hold Lease Sale

252, which in turn tiered to and incorporated by reference the 5-Year Program EIS and Gulf

Program EIS.

152.    BOEM based each of its analyses and conclusions about the environmental effects

of Lease Sale 252 in its Lease Sale EIS on the forecasted levels of oil and gas activity and other

impact-producing factors likely to result from the sale under various scenarios.

153.    BOEM's forecasts in the Lease Sale EIS of the levels of oil and gas activity and

other impact-producing factors likely to result from Lease Sale 252 and the resulting

environmental effects were based on the incorrect and unsubstantiated assumptions that the Well

Control Rule and Production Safety Rule would remain in place and apply to operations under leases executed pursuant to Lease Sale 252, that BSEE had and would continue to vigorously enforce Interior's safety regulations, that the royalty rate for leases in less than 200 meters of water would remain at 18.75%.

154.    The flaws in the scenarios BOEM analyzed in the Lease Sale EIS caused BOEM to underestimate and understate the potential impacts of the lease sale to the environment and wildlife of the Gulf of Mexico and to the communities of the Gulf States that rely on the economic benefits from Gulf ecosystems.  The EIS is thus misleading or incomplete.

155.    Interior may not rely on subsequent statements presented for the first time in the Record of Decision for Lease Sale 252 to cure the flaws in BOEM's NEPA analyses and the Lease Sale EIS.  The information and rationalizations that Interior presented in the Record of Decision for Lease Sale 252 do not provide the necessary support to sustain BOEM's flawed NEPA review or the Lease Sale EIS.

156.    BOEM's reliance on unsubstantiated and incorrect assumptions in estimating the levels of oil and gas activity and other impact-producing factors expected to occur and environmental effects likely to result from Lease Sale 252 violates its duties to use "[a]ccurate scientific analysis" and "high quality" information and to take a hard look at the environmental effects of its actions, in violation of NEPA and its implementing regulations, and is arbitrary and capricious, in violation of the APA.  5 U.S.C. § 706(2)(A); 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1500.1(b), 1502.24.

157.    BOEM's reliance on unsubstantiated and incorrect assumptions regarding safety measures makes its disclosures in the three EISs regarding the risks of blowouts, catastrophic oil spills, and losses of well control arbitrary and misleading, in violation of NEPA and its

implementing regulations, and is arbitrary and capricious, in violation of the APA.  5 U.S.C.

§ 706(2)(A); 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1500.1(b), 1502.24.

158.    By relying on tiered EISs that fail to meet the requirements of NEPA, its

implementing regulations, and governing precedent to support its decision to hold Lease Sale

252, Interior's Record of Decision is arbitrary, capricious, an abuse of discretion, and not in

accordance with law, and without observance of procedures required by law, in violation of

NEPA, 42 U.S.C. § 4332, its implementing regulations, and the APA, 5 U.S.C. §§ 701–706.

159.    These actions have harmed Plaintiffs, and Plaintiffs have no adequate remedy at

law.

### Second Cause of Action

### Violation of NEPA and APA:  Failure to Consider a True No Action Alternative

160.    The allegations made in paragraphs 1–159 are realleged and incorporated by this

reference.

161.    NEPA requires federal agencies, in discussing alternatives in the EIS to the

proposed action, to consider the alternative of no action.  40 C.F.R. § 1502.14(d); *see* 42 U.S.C.

§ 4332(2)(C)(iii).  The agency must compare the impacts of the proposed action with those of the

no action alternative.  *See* 46 Fed. Reg. at 18,027.

162.    BOEM assumed that holding Lease Sale 252 would cause a substantial amount of

oil and gas exploration, development, and production in the Gulf of Mexico.  BOEM assumed

the no action alternative would prevent those new exploration, development, and production

activities.

163.    BOEM irrationally concluded, however, that the same environmental effects

would occur under the no action alternative as under the decision to hold Lease Sale 252.

BOEM's conclusion that the no action alternative and proposed lease sale will have the same

environmental effects is irreconcilably inconsistent with its projection that the proposed lease sale will result in significantly more oil and gas activity than the no action alternative.

164.   BOEM's assumption that the same effects and projected oil production would occur with or without the lease sale violates the requirements in NEPA and its implementing regulations to consider a true no action alternative.  42 U.S.C. § 4332(2)(C)(iii); 40 C.F.R. § 1502.14(d).

165.   BOEM's comparison of the proposed action with a no action alternative that assumes the same environmental effects caused BOEM to irrationally and arbitrarily underestimate and otherwise inaccurately present the environmental effects from Lease Sale 252, in violation of NEPA and its implementing regulations, and the APA.  5 U.S.C. § 706(2)(A); 42 U.S.C. § 4332(2)(C)(iii); 40 C.F.R. § 1502.14(d).

166.   BOEM's inconsistent conclusions regarding effects of the action and no action alternatives violate its duties to use "[a]ccurate scientific analysis" and "high quality" information and to take a hard look at the environmental effects of its actions, in violation of NEPA and its implementing regulations, and is arbitrary and capricious, in violation of the APA. 5 U.S.C. § 706(2)(A); 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1500.1(b), 1502.24.

167.   By relying on EISs that fail to meet the standards laid out in NEPA, its implementing regulations, and governing precedent to support its decision to hold Lease Sale 252, Interior's Record of Decision is arbitrary, capricious, an abuse of discretion, and not in accordance with law, and without observance of procedures required by law, in violation of NEPA, 42 U.S.C. § 4332, its implementing regulations, and the APA, 5 U.S.C. §§ 701–706.

168.   These actions have harmed Plaintiffs, and Plaintiffs have no adequate remedy at law.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

1.     Declare that the EISs issued by BOEM in connection with holding Lease Sale 252 are unlawful, in violation of NEPA and its implementing regulations and the APA;

2.     Declare that Interior's Record of Decision to hold Lease Sale 252 violates NEPA and its implementing regulations, and is arbitrary and capricious and not in accordance with law in violation of the APA;

3.     Vacate the Record of Decision to hold Lease Sale 252;

4.     Vacate or enjoin leases executed pursuant to Lease Sale 252;

5.     Enter any other appropriate injunctive relief to ensure that Defendants comply with NEPA and the APA, and to prevent irreparable harm to Plaintiffs and to the environment until such compliance occurs;

6.     Award Plaintiffs their costs, reasonable attorneys' fees, and other expenses pursuant to 28 U.S.C. § 2412; and

7.     Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted this 13th day of March, 2019.

<div style="margin-left:40%">

*/s/* Stephen D. Mashuda
Stephen D. Mashuda (DC Bar No. WA0005)
Christopher D. Eaton (*pro hac vice* pending)
EARTHJUSTICE
705 Second Ave., Suite 203
Seattle, WA 98104
206-343-7340 Telephone
206-343-1526 Fax
smashuda@earthjustice.org
ceaton@earthjustice.org

</div>

Brettny Hardy (*pro hac vice* pending)
EARTHJUSTICE
50 California St., Suite 500
San Francisco, CA 94111
415-217-2000 Telephone
415-217-2040 Fax
bhardy@earthjustice.org

*Attorneys for Plaintiffs Healthy Gulf, Sierra Club,*
*and Center for Biological Diversity*